United States Court of Appeals,

Eleventh Circuit.

No. 96-3045.

UNITED STATES of America, Plaintiff-Appellee,

v.

Conghau Huu TO a.k.a. Tigo, et al., Defendants-Appellants.

June 23, 1998.

Appeals from the United States District Court for the Middle District of Florida. (No. 94-293-Cr-T-17E), Thomas Wiseman, Jr., Judge.

Before HATCHETT, Chief Judge, and EDMONDSON and COX, Circuit Judges.

HATCHETT, Chief Judge:

In this complex criminal conspiracy case, we affirm the convictions and sentences of four members of a violent gang that committed a series of home and business robberies targeting Asian-American restaurant owners and managers in the Tampa, Florida area. We reverse the convictions of one alleged gang member because the evidence against him was insufficient.

## I. FACTS

On April 23, 1994, Thanh Xuan Nguyen (T.X.) and Tung Van Nguyen (Tony) went to the Saigon Palace restaurant, where they met their roommate, Tuan Duc Phung (Phung), and a number of other individuals attending a birthday party. The birthday party was for a friend of Phung's named Conghau Huu To (To). Before T.X. and Tony arrived at the Saigon Palace, To and An Thanh Le began plotting a scheme to rob the manager of the Big Easy restaurant, Khanh Quoc Le, who happened to be eating at the Saigon Palace. After some preliminary plotting, An Thanh Le left the Saigon Palace to obtain weapons and more manpower. An Thanh Le later returned to the Saigon Palace with weapons and two cohorts, Tam Minh Le and Dung Quoc Nguyen.

Soon after An Thanh Le returned to the Saigon Palace, Phung approached T.X. and Tony and told them to go back to their room at the Rembrandt Apartment complex, so that he could "take care of some business." After T.X. and Tony complied with the request, Phung, To and the others spoke further about the planned robbery. Ultimately, they decided that Phung, Tam Minh Le and Dung Quoc Nguyen should actually commit the robbery. Shortly thereafter, when Khanh Quoc Le left the restaurant, Phung, Dung Quoc Nguyen and Tam Minh Le followed and attacked him. Tam Minh Le struggled with Khanh Quoc Le, shooting him twice. Tam Minh Le then shot Khanh Quoc Le a third time, directly in the chest, before calmly walking back to the Saigon Palace, his shirt covered with blood, and getting a ride home.[1] Tam Minh Le later confessed to T.X. about the murder and also admitted to police that he killed Khanh Quoc Le on orders from others. The murder weapon eventually wound up in To's possession, who then gave it to Quang Ming Tran as collateral for a gambling debt.

Soon after the murder, T.X. and Tony began committing a series of home invasion robberies with An Thanh Le. On at least one occasion, May 13, 1994, Tam Minh Le also participated in a home invasion robbery with T.X., Tony and An Thanh Le. The robberies—often of Asian-American restauranteurs—did not generate much money. Frustrated with the minimal robbery proceeds, T.X. and Tony eventually complained to Phung. Phung suggested that T.X. and Tony meet with To to discuss the possibility of committing robberies with him. T.X. and Tony accepted Phung's suggestion and arranged for a meeting with To. During the meeting, To told T.X. and Tony that they should not deal with An Thanh Le anymore because To suspected An Thanh Le of conspiring with

---

[1]When asked at trial about any money that might have been taken from Khanh Quoc Le during the attempted robbery, T.X. testified that An Thanh Le told him that Khanh Quoc Le did not have any money.

the Federal Bureau of Investigation (FBI). To also told T.X. and Tony about Hai Van Nguyen, who had committed robberies with To in the past.

On May 23, 1994, To, T.X. and Tony decided to rob the manager of a 7-Eleven store where Tony had previously worked. The three men followed the manager, Torboon Gayanont, from the 7-Eleven to the drive-through lane of a bank. As Gayanont waited to make a deposit, To ran up to the car and pointed a gun at Gayanont's head. To then threatened to kill Gayanont if he did not hand over the deposit money. Gayanont quickly relented and handed To a bag containing approximately $8,000. To, T.X. and Tony promptly fled to a friend's home where they counted the money. To gave $2,000 of the stolen deposit money to T.X. and $1,500 to Tony. T.X. and Tony, in turn, each gave $300 to Phung as a show of respect and a reward for introducing them to To.

A few days later, To, T.X. and Tony went to the Mekong restaurant in St. Petersburg, Florida, where they met To's partner, Hai Van Nguyen. Hai Van Nguyen introduced them to five other men who had just come to Florida from Atlanta, Georgia—Tai Tan Pham (Pham), Liem Thanh Luong (Luong), Lap Van Le, Nguyen Tu Doan (Doan) and another individual named Lap. Hai Van Nguyen had met some of the men while on a trip to Atlanta in April 1994. During that trip, Hai Van Nguyen invited some of the Atlanta men to the Tampa area so that he could show them where they could commit robberies. The trial testimony does not establish that Pham heard this invitation before deciding to accompany the Atlanta group to the Tampa area. The trial testimony does, however, reflect that Pham's estranged girlfriend lived in the Tampa area, and that Pham contacted her soon after arriving from Atlanta.

After meeting at the Mekong, all nine men went to the China Town restaurant in Tampa. At the China Town, Hai Van Nguyen announced that "from this day forward, the brothers who come

from Atlanta will stay with us in Tampa." Hai Van Nguyen then promised to rent a house in which everyone could live. Later that evening, the men rented two rooms at the Expressway Inn, and proceeded to spend the next several days together, occasionally using cocaine and marijuana. Many of the men began referring to Hai Van Nguyen and To as "An Hai" and "An Ba," allegedly Vietnamese references to the highest and second highest gang members. To paid the bills for food and the Expressway Inn rooms using the remaining money from the 7-Eleven robbery. Luong suggested that the men collectively adopt the nickname "V-Boys" and get matching spider tattoos.

As the money from the 7-Eleven robbery began to run out, To decided that the group should rob the Shanghai Buffet restaurant, where Phung worked. To discussed his plan in the presence of at least some of the others, including Pham, Tony and Lap Van Le, none of whom expressed any objections or reservations. To did not, however, immediately tell the others when the robbery would occur or the men that would participate in the robbery. On the night of May 28, 1994, To decided that it was time to commit the robbery. He paged T.X., who was at the China Town restaurant with Tony, Luong and Pham, and instructed him to return to the Expressway Inn. When T.X. arrived at the Expressway Inn, he met To, Hai Van Nguyen, Doan and Lap Van Le. To decided that T.X., Doan and Lap Van Le would help with the robbery. Hai Van Nguyen went to the China Town to wait with Luong and the others.

To, T.X., Doan and Lap Van Le then drove to the Shanghai Buffet, armed with a .380 handgun, a BB gun and a knife. When the restaurant owners, Richard and Gina Lin, left for the evening, To and his cohorts followed the Lins home and accosted them. They tied the Lins up, covered their eyes with duct tape, and, on several occasions, threatened to kill them. One of the robbers put a knife to Gina Lin's neck, while another used a handgun and pointed it at the Lins'

4

heads.  Unsatisfied with the money and jewelry found at the house, the robbers brutally assaulted Richard Lin until he acknowledged that more money was kept back at the Shanghai Buffet in a safe. To then instructed T.X. and Lap Van Le to keep Gina Lin and the Lins' children hostage at the house while he and Doan drove Richard Lin back to the Shanghai Buffet to get the money from the safe. When To and Doan arrived at the Shanghai Buffet with Richard Lin, Lin removed $10,000 from the safe and gave it to To. The three men then returned to Richard Lin's house.  As To and his cohorts left the Lins' house, they told Richard Lin they would kill his whole family if he called the police.

T.X. then called Luong at the China Town and told him that the robbery was complete and that Luong should return to the Expressway Inn. Luong promptly gathered his companions and returned to the Expressway Inn. Phung also came to the Expressway Inn, and, as he entered the room, stated that what the group had done "was good."[2]  When everyone was assembled, To and Hai Van Nguyen counted the money and gave everyone $500, except for Hai Van Nguyen, who got $1,000 so he could rent a house for the group.[3]  To also divided up the jewelry that was stolen from the Lins, including chains and rings.  The next day, the entire group moved to another motel.

On May 30, 1994, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen came to the China Town restaurant together, where To and his cohorts also happened to be dining.  As An Thanh Le entered the China Town, To indicated that he wanted to shoot An Thanh Le. As noted earlier, To suspected An Thanh Le of working for the FBI. Neither To nor any of his cohorts had a weapon with

_____

[2]At trial, T.X. indicated that he interpreted Phung's comment to mean that the group had done a good job with the robbery.

[3]The record is not altogether consistent with respect to when Hai Van Nguyen arrived, and with whom, or with respect to whether he counted the money or simply received money.  The facts as recounted above, however, seem most plausible in light of all the trial testimony.

them so To sent Tony back to the motel for guns.[4] Tony returned with two guns and gave one to Luong, who displayed the gun openly. Hai Van Nguyen then expressed concern about any action being taken against An Thanh Le in the restaurant because he feared that one of the customers might be an FBI agent. Luong stated that he did not care, as he was prepared to shoot both An Thanh Le and the FBI agent. Cooler heads prevailed, and An Thanh Le left the China Town restaurant unharmed, as did Tam Minh Le and Dung Quoc Nguyen. As An Thanh Le and his companions left, however, Luong and Tony followed them outside and ultimately chased after An Thanh Le's vehicle for about a mile.

On or about June 1, 1994, To again gathered guns and went after An Thanh Le, this time at An Thanh Le's home. Doan accompanied To and tried to shoot An Thanh Le with a gun that Hai Van Nguyen had previously given him. On June 15, 1994, police arrested Pham, Doan, Hai Van Nguyen, Tony, Lap Van Le, Luong and T.X. outside the China Town restaurant. Lap Van Le, Hai Van Nguyen, Doan and Pham were in Lap Van Le's Nissan Maxima. Tony, Luong, T.X. and a juvenile were in Tony's Toyota Supra. T.X. had a .380 handgun in his waistband. Luong had a 9mm Glock in his waistband. Police found a 9mm pistol, a .380 semi-automatic handgun, a semi-automatic pistol, a BB gun, a magazine for the 9mm pistol and a roll of duct tape in the Maxima. The police also noticed that three members of the group—Doan, Pham and T.X.—had a series of three cigarette burns on their arms, allegedly a mark of courage and loyalty. At trial,

---

[4]In its brief to the panel, the government contended that Pham went with Tony to obtain guns. During oral argument, however, the government conceded that this contention was inconsistent with the record. Our independent review of the record reveals the same. We note that the government also argued during its closing statement to the jury that Pham went to obtain guns. Pham did not object to the improper closing argument, however, and does not on appeal rely on the improper closing argument as a basis for reversal.

however, Pham's estranged girlfriend testified that Pham had inflicted at least one of the burns during an argument with her about their relationship.

## II. PROCEDURAL HISTORY

On December 21, 1994, a federal grand jury in the Middle District of Florida returned a multi-count indictment against eleven defendants, including all the appellants. Count One charged To, Hai Van Nguyen, Lap Van Le, Phung, Tony, Doan, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen with racketeering, in violation of 18 U.S.C. § 1962(c) (substantive RICO). Count One charged several racketeering acts against various defendants: conspiracy to commit a Hobbs Act robbery (racketeering act 1(a)), conspiracy to commit robbery in violation of state law (act 1(b)), attempted Hobbs Act robbery of Khanh Quoc Le on April 23, 1994 (act 2(a)), murder of Khanh Quoc Le on April 23, 1994 (act 2(b)), robbery on May 7, 1994 (act 3), robbery on May 13, 1994 (act 4), Hobbs Act robbery on May 23, 1994 (act 5), Hobbs Act robbery on May 29, 1994 (act 6), the May 31, 1994 attempted murder of An Thanh Le to prevent his communicating to law enforcement information about a federal offense (act 7(a)), and the May 31, 1994 attempted murder of An Thanh Le (act 7(b)).

Count Two charged To, Hai Van Nguyen, Lap Van Le, Phung, Pham, Luong, Tony, Doan, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen with conspiring to engage in racketeering, in violation of 18 U.S.C. § 1962(d) (RICO conspiracy); Count Three charged To, Hai Van Nguyen, Lap Van Le, Phung, Pham, Luong, Tony, Doan, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen with conspiring to commit robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) and (b)(1); Count Four charged To, Phung, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen with attempted robbery on April 23, 1994, in violation of the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2;

7

Count Five charged To and Tony with robbery on May 23, 1994, in violation of the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2; Count Six charged To, Hai Van Nguyen, Lap Van Le, Phung, Pham, Luong, Tony and Doan with robbery on May 29, 1994, in violation of the Hobbs Act, 18 U.S.C. §§ 1951(a), (b)(1) and 2; Count Seven charged To, Phung, An Thanh Le, Tam Minh Le and Dung Quoc Nguyen with using and carrying firearms on April 23, 1994, during and in relation to a federal crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2; Count Eight charged To and Tony with using and carrying firearms on May 23, 1994, during and in relation to a federal crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2; and Count Nine charged To, Lap Van Le, Phung and Doan with using and carrying firearms on May 29, 1994, during and in relation to a federal crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2.

Six defendants, Tony, An Thanh Le, Lap Van Le, Dung Quoc Nguyen, Doan and Phung, pleaded guilty to certain of the counts.

On February 6, 1996, trial commenced against the five remaining defendants, To, Hai Van Nguyen, Pham, Luong and Tam Minh Le. Following the conclusion of the government's case, the district court dismissed racketeering acts three and four, the May 7 and 13, 1994 home-invasion robberies, on the ground that they were part of a different enterprise.

On March 1, 1996, the jury found To guilty of all nine counts and racketeering acts 1(a), 1(b), 2(a), 2(b), 5, 6 and 7(b); Hai Van Nguyen guilty of Counts One, Two, Three and Six, the four counts against him, including racketeering acts 1(a), 1(b) and 6; Pham guilty of Counts Two, Three and Six, the three counts against him; Luong guilty of Counts Two, Three and Six, the three counts against him; and Tam Minh Le guilty of Counts One, Two, Three, Four and Seven, the five counts against him, including racketeering acts 1(a), 2(a) and 2(b).

8

On July 16, 1996, the district court sentenced the appellants. To received a sentence of life imprisonment plus forty-five years. Tam Minh Le received a sentence of 420 months of imprisonment. Hai Van Nguyen received a sentence of 165 months of imprisonment. Pham and Luong each received sentences of 57 months of imprisonment.

## III. ISSUES

We discuss the following issues: (1) whether the district court erred in denying Pham's motion for a judgment of acquittal and alternative motion for a new trial based on the alleged insufficiency of the evidence; and (2) whether the evidence against Tam Minh Le was insufficient to justify his convictions on the RICO conspiracy and substantive RICO counts.[5]

## IV. DISCUSSION

A. *Standards of Review*

Whether the record contains sufficient evidence to support the jury's verdict is a question of law subject to *de novo* review. *United States v. Harris,* 20 F.3d 445, 452 (11th Cir.), *cert. denied,* 513 U.S. 967, 1031, 1032, 115 S.Ct. 434, 611, 612, 130 L.Ed.2d 346, 521 (1994). When conducting

---

[5]We affirm the convictions and sentences of To, Hai Van Nguyen and Luong summarily, as their claims of error are without merit. *See* 11th Cir. R. 36-1. All three of these appellants first contend that the evidence was insufficient to sustain their convictions. To was the ringleader of the entire alleged enterprise and personally participated in the robberies of Gayanont and the Lins, as well as the attempted murder of An Thanh Le. To also helped orchestrate the robbery and murder of Khanh Quoc Le. Firearms were used in connection with all of the offenses. Hai Van Nguyen was the alleged enterprise's "chief of recruitment" and "comptroller." Luong proposed the name V-Boys for the alleged enterprise, received the "all clear" telephone call from T.X. after the Lin family robbery, shared in the proceeds of that crime and plotted to kill An Thanh Le. The evidence to convict these appellants was not just sufficient, it was overwhelming. The other issues these appellants raise relate to alleged flaws in the indictment, trial errors and sentencing matters. We have carefully considered these issues and find no reversible error. To the extent that Tam Minh Le has adopted his fellow appellants' arguments, or alleged other errors not discussed in the main body of our opinion, we also find those arguments to be without merit.

the review of the record, we view "the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. High,* 117 F.3d 464, 467 (11th Cir.1997). We must uphold the jury's verdict whenever a reasonable factfinder could conclude that the evidence establishes guilt beyond a reasonable doubt. *High,* 117 F.3d at 467-68.

A district court's order denying a motion for a new trial based on the weight of the evidence is subject to review for abuse of discretion. *United States v. Cox,* 995 F.2d 1041, 1044 (11th Cir.1993).

B. *The Counts Against Tam Minh Le and Pham*

As noted above, the jury convicted both Tam Minh Le and Pham of RICO and Hobbs Act related offenses. Both men were convicted on Count Two, the RICO conspiracy, and Count Three, the Hobbs Act conspiracy. Tam Minh Le was also convicted on Count One, the substantive RICO offense; Count Four, the attempted Hobbs Act robbery of Khanh Quoc Le; and Count Seven, for carrying a firearm during the attempted Hobbs Act robbery and murder of Khanh Quoc Le.[6] Pham was also convicted of a non-overlapping offense, Count Six, the Hobbs Act robbery of the Lins. Because the issues of evidentiary sufficiency we consider are linked to the requisite elements of the RICO and Hobbs Act related offenses, we discuss each of the counts of conviction, assessing the relevant evidence with respect to Tam Minh Le and/or Pham as we proceed.

---

[6]In his initial brief, Tam Minh Le challenges the sufficiency of the evidence only with respect to his convictions on the RICO conspiracy and substantive RICO counts. In his reply brief, Tam Minh Le generally "adopts the arguments raised by his co-appellants on appeal." We do not read those coappellant briefs to challenge any evidence or legal principle underlying Tam Minh Le's convictions on Count Three, Count Four or Count Seven. We thus affirm those counts of conviction without comment.

1. *The RICO Conspiracy*

To establish a RICO conspiracy, the government needed to prove that Tam Minh Le and Pham " "objectively manifested, through words or actions, an agreement to participate in ... the affairs of [an] enterprise through the commission of two or more predicate crimes.' " *United States v. Starrett,* 55 F.3d 1525, 1543 (11th Cir.1995) (quoting *United States v. Russo,* 796 F.2d 1443, 1455 (11th Cir.1986)), *cert. denied,* 517 U.S. 1111, 1127, 116 S.Ct. 1335, 1369, 134 L.Ed.2d 485, 534 (1996).  As we assess that proof, "[t]he focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts." *Starrett,* 55 F.3d at 1543.  The enterprise need not be a legal entity such as a corporation or partnership;  it may also be "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).

In this case, it is clear that the government could prove Tam Minh Le and Pham's agreement to participate in either of two ways.  First, the government could show an agreement on an overall objective. *United States v. Church,* 955 F.2d 688, 694 (11th Cir.), *cert. denied,* 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992).  An agreement on an overall objective may be proved "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Starrett,* 55 F.3d at 1544 (internal quotation marks omitted).  Second, the government could show that a "defendant agreed personally to commit two predicate acts and therefore to participate in a "single objective' conspiracy." *Church,* 955 F.2d at 694.  If the government proves an agreement

11

on an overall objective, however, it does not have to prove that the defendant agreed personally to commit two predicate acts. *Starrett,* 55 F.3d at 1544.

> Regardless of the method used to prove the agreement, "the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime described in the indictment, or knew his fellow conspirators, or was aware of all the details of the conspiracy."

*Starrett,* 55 F.3d at 1544 (quoting *United States v. Pepe,* 747 F.2d 632, 659 (11th Cir.1984)). Moreover, the fact that "each conspirator may have contemplated participating in different and unrelated crimes is irrelevant." *Starrett,* 55 F.3d at 1544 (internal quotation marks omitted).

Tam Minh Le and Pham both argue that the government failed to prove their intent to participate in the affairs of an enterprise through a pattern of racketeering activity. Pham contends that the government failed to demonstrate, even circumstantially, that he agreed to participate in the objectives of an enterprise, because the evidence established no connection between Pham and the enterprise's predicate acts either before or after the evening and morning of May 28-29, 1994—the date of the Lin family robbery. In addition, Pham adopts his coappellants' argument that the evidence involving him with respect to the Lin family robbery establishes only his mere association with persons involved in a conspiracy. Pham also contends that the government failed to prove that he conspired to violate RICO under a "single objective" theory, as the record does not show that he personally agreed to commit two predicate acts.

Tam Minh Le echoes Pham's arguments, but with a slight variance. Tam Minh Le concedes his involvement in the murder of Khanh Quoc Le, but denies that his involvement in that offense may serve as a basis for RICO conspiracy liability. According to Tam Minh Le, his involvement with the alleged enterprise began and ended at Saigon Palace on the night Khanh Quoc Le died, save for the day in late May 1994 when he accompanied An Thanh Le to the China Town Restaurant.

12

The fact that Tam Minh Le knew or associated with some of the enterprise members is, Tam Minh Le contends, of no consequence as RICO does not punish mere association with conspirators or simple knowledge of illegal activity.

The government counters that it introduced ample evidence that Tam Minh Le and Pham agreed to an overall conspiracy objective to support the enterprise through a series of robberies within the Asian-American community. With respect to Tam Minh Le specifically, the government also suggests that it proved that Tam Minh Le agreed personally to commit two predicate acts and therefore to participate in a "single objective" conspiracy. The government further contends that Tam Minh Le's participation in the conspiracy was not limited to his involvement in the attempted Hobbs Act robbery and murder of Khanh Quoc Le, as Tam Minh Le continued to associate with enterprise members after the Saigon Palace episode. In addition, the government argues that Pham's commitment to the overall conspiracy objective was proven based on: (1) his presence and failure to object during the planning of the Lin family robbery; (2) his trip back to the Expressway Inn following the telephone call from T.X. to Luong; (3) his receipt of proceeds from the Lin family robbery; and (4) the three burn marks on his arms, which were similar to marks found on T.X. and Doan.[7]

Although it is a close call, we find the government's argument and proffered evidence too attenuated to sustain the RICO conspiracy conviction against Pham. We base our conclusion, in large part, on our holding in *United States v. Gonzalez,* 921 F.2d 1530, 1543 n. 21 (11th Cir.), *cert. denied,* 502 U.S. 827, 860, 112 S.Ct. 96, 178, 116 L.Ed.2d 68, 140 (1991). In *Gonzalez,* we

---

[7]As noted above, the government also argued at trial and in its appellate brief that Pham's commitment was proven based on his alleged retrieval of a gun at To's request. The government now abandons that argument.

considered the arguments of several individuals convicted of RICO conspiracy for their involvement in a drug importation ring. 921 F.2d at 1532. All of the individuals made arguments challenging the legal sufficiency of the evidence underlying their convictions. 921 F.2d at 1539. Two of the arguments advanced in *Gonzalez* are relevant to our analysis. First, some of the individuals argued that the evidence failed to show their participation in the enterprise's affairs through two predicate acts constituting a pattern of racketeering activity. 921 F.2d at 1539. One of the individuals specifically argued that he joined any conspiracy, if at all, only after the majority of the predicate acts charged to the enterprise occurred. 921 F.2d at 1543 n. 21. As a result, he argued, he could not have agreed to those occurrences that established the actual pattern of racketeering activity. 921 F.2d at 1543 n. 21. Second, some of the individuals argued that because the government's evidence showed only a limited agreement on their part, the government needed to present the proof required for a "single objective" conspiracy, *i.e.,* "proof of agreement to personally commit two predicate acts." 921 F.2d at 1543. Pham, in essence, repeats these same arguments, suggesting that any proof of his relationship with the enterprise members is insufficient to establish RICO liability because he either joined the agreement too late, or because the evidence did not tie him to two predicate acts. We agree.

Even if we assume that Pham was a willing accomplice to the robbery of the Lins, that fact alone would not prove that he agreed to an overall objective of supporting the enterprise through a *series* of robberies within the Asian-American community. The government offered no proof that Pham was present when Hai Van Nguyen recruited some of Pham's fellow Atlantans to Tampa for the general purpose of committing robberies. Nor did the government offer proof that Pham had a criminal relationship with the other Atlantans that predated his decision to accompany them to the

14

Tampa area. The government also did not offer any significant circumstantial proof of Pham's agreement to an overall objective. Rather, the government's evidence effectively showed only two things—that Pham had three cigarette burns on his arm like several other enterprise members, and that Pham associated with members of the enterprise. The cigarette burn evidence is, in our view, insubstantial, because the uncontroverted evidence at trial established that Pham put at least one of the cigarette burns on himself in front of his estranged girlfriend for reasons wholly unrelated to the enterprise. Even if a juror could reasonably disbelieve that uncontroverted evidence, the fact remains that only three of the eleven defendants indicted in this case had cigarette burn marks on their arms. As a result, no reasonable juror could have concluded that the cigarette burn marks signified some conspiratorial agreement between Pham and the other enterprise members, many of whom had no similar marks on their arms. The evidence of Pham's association with enterprise members in this case is also inconsequential. "A defendant must be convicted on the basis of his own proven conduct, association is not enough. RICO does not punish "mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status.' " *Gonzalez,* 921 F.2d at 1542 (quoting *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.1978)). As Pham's counsel argued at trial, the evidence in this case proved, at most, that the enterprise members sought to recruit Pham with free housing and a gift of ready cash from the Lin family robbery; it did not show that Pham ever agreed to join the enterprise. The government also failed to show Pham's involvement in a "single objective" conspiracy, as no evidence showed that Pham personally agreed to commit two predicate acts.

The evidence of Tam Minh Le's participation in a RICO conspiracy is, in our view, much stronger and sufficient to sustain his conviction on Count Two. We reach this conclusion based,

15

again, on our holding in *Gonzalez*. In that case we considered an argument from one individual, Michael Timothy Sweeton, that was premised on the fact that he was linked to only one incident of drug importation. 921 F.2d at 1542-45. We first determined that the test for establishing Sweeton's RICO conspiracy liability under such facts was the "single objective" test. 921 F.2d at 1542-43. Under this test, we indicated that the government needed to show Sweeton's agreement to commit personally two predicate acts. 921 F.2d at 1543. After finding that Sweeton had committed two predicate acts in connection with the single incident of drug importation, we then considered the impact of the fact that the two acts occurred in close temporal proximity. 921 F.2d at 1545. We concluded that predicate acts occurring in close temporal proximity may satisfy RICO's pattern requirement if "the predicates themselves amount to, or ... otherwise constitute a threat of *continuing* racketeering activity." 921 F.2d at 1545 (internal quotation marks omitted) (emphasis in original). We then quoted the following explanation of our conclusion from the Supreme Court's decision in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 242-43, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989):

> Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves [may] include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

*Gonzalez,* 921 F.2d at 1545 (alteration in original). Finally, turning to Sweeton's specific argument, we found that RICO's pattern requirement was met in his case because his actions, albeit close in time, took place as part of the enterprise's drug importation operation, an operation that existed before Sweeton's involvement and continued to exist after Sweeton's involvement ended. 921 F.2d

16

at 1545. Because the *enterprise's* operations were ongoing, we reasoned, the "threat of continuing racketeering activity was present, and was, in fact a threat fulfilled." 921 F.2d at 1545.

Applying the rationale of *Gonzalez* to Tam Minh Le's case, we conclude that Tam Minh Le's conviction must be affirmed. The evidence is sufficient to show that he personally committed three predicate acts: conspiracy to commit a Hobbs Act robbery; attempted Hobbs Act robbery; and murder. Although the acts all occurred within a span of several hours, To, Phung and An Thanh Le—all enterprise members—were also deeply involved in the incident, and the targeted victim, an Asian-American restauranteur, fit the profile that the enterprise specialized in robbing. Because the enterprise continued to exist and continued targeting Asian-Americans in general—and restauranteurs in particular—a reasonable juror could conclude that the threat of continuing racketeering activity was present in this case. *Gonzalez,* 921 F.2d at 1545.

2. *The Substantive RICO Offense*

Having concluded that Tam Minh Le's conviction for RICO conspiracy must be affirmed, we also conclude that his convictions must be upheld on the other counts against him. To establish a substantive RICO violation under 18 U.S.C. § 1962(c), the government needed to prove: (1) that an enterprise existed; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either directly or indirectly, in the conduct of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity. *Starrett,* 55 F.3d at 1541. The fifth element contains two components: (1) the defendants' predicate acts must be related to the enterprise charged in the indictment; and (2) the predicate acts must actually form a pattern, *i.e.,* relate to each other and have continuity. *Starrett,* 55 F.3d at 1542-43.

17

Tam Minh Le argues that the evidence in this case failed to establish elements four and five. With respect to element five, Tam Minh Le's argument mirrors his argument regarding his RICO conspiracy liability. We reject the argument for the reasons stated above. With respect to element four, Tam Minh Le argues that he cannot be held liable under the so-called *Reves* operation or management test which this court adopted in *Starrett,* because he did not implement any enterprise decisions relating to any enterprise activities subsequent to the attempted robbery and murder of Khanh Quoc Le. *See Starrett,* 55 F.3d at 1542. This argument is unavailing because Tam Minh Le's knowing commission of multiple predicate acts in connection with the attempted robbery and murder of Khanh Quoc Le is all that is required to satisfy the fourth element of a substantive RICO violation in this case. We therefore affirm Tam Minh Le's conviction for the substantive RICO offense, just as we affirm his conviction for RICO conspiracy.

3. *The Hobbs Act Conspiracy and Hobbs Act Robbery of the Lins*

To prove a Hobbs Act conspiracy under 18 U.S.C. § 1951(a) and (b)(1) in this case, the government needed to prove that: (1) two or more persons agreed to commit a robbery encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal. *United States v. Thomas,* 8 F.3d 1552, 1556 (11th Cir.1993). "Presence with conspirators alone, however, or close association with them, is not by itself sufficient proof of participation in a conspiracy." *Thomas,* 8 F.3d at 1556 (citation omitted).

Pham argues that the evidence presented at trial in this case establishes nothing more than his mere association with the individuals conspiring to commit Hobbs Act robberies. The government contends that the jury was entitled to infer Pham's knowing and voluntary participation

18

in the Hobbs Act conspiracy from the following evidence: (1) his presence during discussions of the planned robbery; (2) his decision not to object to the plan; (3) his waiting with Luong at the China Town during the Lin family robbery; (4) his decision to return to the Expressway Inn with Luong following the robbery; and (5) his receipt of some of the robbery proceeds following the robbery. Although we find the issue close, we ultimately agree with Pham that the government's evidence was insufficient, even when viewed in the light most favorable to the government. The government presented no evidence that Pham was actively involved in the planning of the Lin family robbery, so Pham's presence during discussions of the robbery and his failure to object establish only that he knew of the planned robbery. As we held in *Thomas,* however, mere knowledge does not support the conclusion that a defendant "voluntarily participated in the agreement or the accomplishments of its goals." 8 F.3d at 1558. Likewise, Pham's presence at the China Town with Luong, and his return to the Expressway Inn, do not prove participation. The record is clear that no one but To knew when the robbery would take place. Pham's decision to go to the China Town with Luong, Tony and T.X. occurred before To paged T.X. and told him the robbery would take place that evening. Pham's decision to remain at the China Town—unaware that the robbery was even taking place—cannot thus be seen as evidence of participation in a conspiracy. Neither can Pham's decision to return to the Expressway Inn, where he was staying along with Luong, give rise to an inference of participation—especially given the absence of record evidence that Luong told Pham about the completed robbery before the men returned to the Expressway Inn. While we find Pham's receipt of proceeds from the Lin robbery along with the enterprise members far more problematic, that fact alone—occurring as it did after the robbery was effectively complete and viewed in light of the recruitment style hospitality To and Hai Van Nguyen were bestowing on the recent arrivals

19

from Atlanta—is also insufficient to show Pham's voluntary participation in the Hobbs Act conspiracy at issue. *Cf. United States v. Richardson,* 596 F.2d 157, 163 (6th Cir.1979) (no Hobbs Act conspiracy conviction of deputy sheriff who received free whiskey during the conspiracy period where no one suggested that it had been given in exchange for protection). We thus reverse Pham's conviction on Count Three, the Hobbs Act conspiracy.

Because the government's only theory of support for the substantive Hobbs Act count against Pham is based on so-called *Pinkerton* doctrine liability, *i.e.,* the view that each member of a conspiracy is liable for all reasonably foreseeable crimes committed during and in furtherance of the conspiracy, we also reverse Pham's conviction on Count Six, the Hobbs Act robbery of the Lins. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

## V. CONCLUSION

Because the evidence was insufficient to support the convictions of Pham, we reverse on all counts against him. We affirm the convictions and sentences of all the other appellants.

AFFIRMED IN PART and REVERSED IN PART.