[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 27, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-11530
Non-Argument Calendar

_____

D. C. Docket No. 07-20756-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON BLANCO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 27, 2009)

Before CARNES, HULL and WILSON, Circuit Judges.

PER CURIAM:

After a jury trial, Ramon Blanco appeals his convictions and sentences for

conspiracy to possess with intent to distribute five kilograms or more of cocaine,

21 U.S.C. §§ 841(b)(1)(A), 846 (Count1); attempt to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. §§ 841(b)(1)(A), 846 (Count 2); conspiracy to interfere with commerce by robbery, 18 U.S.C. § 1951(a) (Count 3); attempt to interfere with commerce by robbery, 18 U.S.C. §§ 2 and 1951(a) (Count 4); conspiracy to carry a firearm during and in relation to a crime of violence and a drug trafficking crime, 18 U.S.C. § 924(o) (Count 5); and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, 18 U.S.C. §§ 2 and 924(c)(1)(A) (Count 6).   After review, we affirm.

## I.  BACKGROUND FACTS

Because Blanco challenges the sufficiency of the government's evidence to support his six convictions, we first outline the trial evidence that supports the jury's verdict.  Blanco and six codefendants were charged in connection with a government sting operation.  All of Blanco's codefendants pled guilty prior to trial, and two of the codefendants testified against Blanco.

The sting operation began when a confidential informant called "J.C." contacted Special Agent Jessica Rabago of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  J.C. told Agent Rabago that a man named Gumercindo Cruz, one of the codefendants in this case, had expressed interest in

2

committing a robbery for narcotics. Under ATF supervision, J.C. and another confidential informant, Humberto Gamez, constructed a scenario to present to Cruz. J.C. would introduce Gamez as a disgruntled drug courier who wanted to rob his boss of approximately 25 to 30 kilograms of cocaine from a shipment coming from Puerto Rico and needed a crew to help.

Gamez met with Cruz several times. The meetings were recorded by a small recording device worn by Gamez. Law enforcement agents in a surveillance van monitored and videotaped the meetings. The first meeting occurred on July 26, 2007 in Gamez's vehicle, which was parked in a Burger King parking lot. During the meeting, Gamez explained that a cocaine shipment was arriving at a Miami airport from Puerto Rico in a couple of weeks and Gamez's job was to transport the drugs from the airport to a stash house with an armed guard. Gamez proposed that Cruz steal the cocaine shipment during the transport. Cruz agreed and said that he would recruit "professionals" from Chicago to help as they had committed similar robberies in the past.

On August 2, 2007, Gamez met with Cruz and Jesus Mejias, another codefendant, who was a drug dealer from Chicago. Mejias was one of the codefendants who testified at defendant Blanco's trial. Cruz and Mejias agreed to rob 25 to 30 kilograms of cocaine. Mejias told Gamez that two more people would

come to help with the robbery and, with advance notice, he would have his team in Miami and ready two days before the robbery. The men agreed that, after Gamez took 10 kilograms for himself, the rest of the group would divide the remaining cocaine.

After meeting with Gamez, Mejias contacted defendant Blanco, with whom he had been friends for more than ten years. Blanco previously had told Mejias he wanted to participate in "something like this." Mejias and Defendant Blanco discussed different ways to steal the cocaine. Blanco informed Mejias that he and another codefendant, Robert Ontivero, would come from Chicago to help with the robbery. On August 21, 2007, Gamez told Cruz that the cocaine shipment would be arriving the following week.

The next day, August 22, 2007, Gamez met with Cruz and Mejias, again in a Burger King parking lot. Mejias reported to Gamez that he had talked with the men from Chicago and indicated that they wanted more information to better plan the robbery. Gamez told Mejias that he would pick up and transport the cocaine under the presence of an armed guard. Mejias discussed either having his men crash into the car containing Gamez and the cocaine, or having his men dress as police and simulate an accident in order to stop Gamez's vehicle and take the cocaine. Mejias wanted to know the route Gamez would take from the airport so

4

his men could be familiar with it and could set up a hotel room and rental car in a convenient place. Mejias explained that Blanco, who had a lot of experience with drug robberies, was planning the details. Mejias agreed to have his team in Miami several days before the robbery so Gamez could meet them and they could do a dry run. After Mejias confirmed with Defendant Blanco that the shipment would soon arrive, Blanco responded that he would bring Ontivero from Chicago and would find additional help in Miami to carry out the robbery. Blanco then called another codefendant, Ulises Cao, in Miami. At Blanco's request, Cao recruited three brothers, Justino Sanches-Estrada, Wilfredo Torres-Estrada and Jose Hidalgo-Meza, from the Miami area to participate in the robbery. On August 26, 2007, Mejias told Gamez that everything was thoroughly planned and that the men were ready to fly from Chicago.

On September 4, 2007, Defendant Blanco flew from Chicago to Miami and rented a room at a hotel near the airport for September 4 through 6. Blanco purchased a return airplane ticket for September 7, 2007. On the evening of September 4, Mejias, Blanco and Ontivero met with Cao at their hotel, and Cao introduced Sanches-Estrada, Torres-Estrada and Hidalgo-Meza. Blanco and Ontivero told the recruits that the cocaine was coming from Puerto Rico and explained the robbery plan. Sanchez-Estrada was told he would use his truck to

5

crash into the back of the vehicle transporting the drugs and that Ontivero would be the one to approach the vehicle and take the drugs. Sanchez-Estrada was told that he and one of his brothers would each be given two kilograms of cocaine after the robbery. Blanco warned that the shipment would probably have an armed guard and advised the men to bring a weapon. Later, Sanchez-Estrada's brother, Hidalgo-Meza, obtained a firearm for the robbery.

On the morning of September 5, 2007, Gamez met with Cruz, Mejias, Blanco and Ontivero in the parking lot of the El Tropico restaurant. The men confirmed that they were still interested in proceeding with the robbery and discussed the final details. When the meeting began, the men gathered behind a Ford Explorer. Initially, Blanco was sitting in the driver's seat of the Explorer, but he later exited the vehicle and participated in the meeting for approximately three minutes. During this time, Blanco described the two options for stopping Gamez's vehicle, and Gamez chose the option that used fake police. Blanco then re-entered the Explorer while the other men continued talking for several minutes.

Later, Gamez called Mejias and told him the cocaine shipment would be arriving at Tamiami Airport that evening. Gamez arranged for a final meeting just before the robbery in an Office Max parking lot. On the way to the final meeting, Mejias and Blanco discussed their roles in the robbery. Under the plan, Blanco

6

was going to supervise the area in case he was needed to block someone with his car, while Ontivero would carry out the robbery using a gun Mejias had obtained. At the meeting, Mejias and Ontivero review the plan with Gamez and then Gamez instructed them to follow him to the airport. After the meeting finished, the robbers departed in four cars, with Blanco's vehicle trailing the others by several minutes. Officers arrested the men as they drove toward the airport. Two guns were recovered from the vehicle occupied by Hidalgo-Meza, Ontivero and Torres-Estrada, but no gun was found in Blanco's vehicle.

## II. DISCUSSION

### A.    Sufficiency of the Evidence[1]

#### 1.    Cocaine Offenses

As for the drug charges in Counts 1 and 2, the government's evidence supports the jury's finding that Blanco conspired with his codefendants and attempted to possess with an intent to distribute cocaine. Blanco's conversations with Gamez, Mejias and other codefendants showed that he knew of, voluntarily

---

[1]We review de novo a district court's denial of a judgment of acquittal on sufficiency of evidence grounds. United States v. Yates, 438 F.3d 1307, 1311-12 (11th Cir. 2006) (en banc). In considering the sufficiency of the evidence, we view the evidence in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor. United States v. Nolan, 223 F.3d 1311, 1314 (11th Cir. 2000). We must affirm the convictions if, based on the evidence, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quotation marks omitted).

7

agreed to participate in and helped plan the robbery of the cocaine.[2] Contrary to

Blanco's assertions, this is not a "mere presence" case. Two codefendants and a

confidential informant provided testimony, supported by video and audio

recordings, that Blanco was intimately involved with the planning of the cocaine

robbery. Blanco's intent to distribute the cocaine once he stole it could be inferred

from the large amount of cocaine involved, 15 to 20 kilograms (which the seven

codefendants agreed to divide amongst themselves), and Blanco's past

involvement in the drug trade. See United States v. Gardiner, 955 F.2d 1492,

1495-96 (11th Cir. 1992) (concluding approximately three kilograms of cocaine

was sufficient to support an inference of an intent to distribute).

Blanco also took numerous substantial steps toward the commission of the

cocaine robbery, including planning out the details with Mejias, recruiting other

people to help, flying from Chicago to Miami, renting a hotel room and a vehicle

to use during the robbery, instructing his coconspirators on their roles in the

---

[2]See United States Mejias, 97 F.3d 1391, 1392 (11th Cir. 1996) (stating that the elements of cocaine conspiracy include: "(1) that a conspiracy to possess cocaine existed; (2) that the defendant knew of the goal of the conspiracy; and (3) that the defendant, with knowledge, voluntarily joined it"); United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001) (outlining as elements of attempted possession with intent to distribute cocaine as: "(1) act[ing] with the kind of culpability required to possess cocaine knowingly and wilfully and with the intent to distribute it; and (2) engag[ing] in conduct which constitutes a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent").

robbery and showing up at the final rendevous point just before the robbery was to take place. Indeed, there was little left to do given that the conspirators thought they were on their way to the robbery when they were arrested.

2.      Hobbs Act Offenses

The government's evidence was also sufficient to support Counts 3 and 4, the Hobbs Act offenses. The Hobbs Act prohibits attempts, and conspiracies, to obstruct, delay or affect commerce by robbery or extortion. See 18 U.S.C. § 1951(a). To prove the underlying substantive Hobbs Act offense, the government must show: (1) a robbery, and (2) an effect on interstate commerce. See United States v. Taylor, 480 F.3d 1025, 1027 (11th Cir. 2007); see also United States v. To, 144 F.3d 737, 747-48 (11th Cir. 1998). Where a defendant is charged with attempt or conspiracy to violate the Hobbs Act, "the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce or by evidence of actual, de minimis impact." United States v. Le, 256 F.3d 1229, 1232 (11th Cir. 2001) (quotation marks omitted).

Blanco's argument that the interstate commerce nexus, required under the Hobbs Act, was not met because the "commerce" here – the cocaine shipment from Puerto Rico – was fictional is foreclosed by United States v. Taylor, 480 F.3d 1025, 1027 (11th Cir. 2007) (rejecting the argument that because the object of the

9

Hobbs Act offenses was part of a government sting operation and entirely fictitious, there was no impact on interstate commerce).[3]  Although Blanco argues that Taylor was wrongly decided, we are bound by our precedent unless and until it is overruled by this Court sitting en banc or the Supreme Court.  See United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008).

There was also sufficient evidence that Blanco knew the fictitious cocaine shipment would be traveling in interstate commerce.  Codefendant Mejias and confidential informant Gamez both testified that it was understood that the cocaine shipment was coming from Puerto Rico and would be arriving at a Miami area airport.  The jury heard Blanco's impeachment evidence at trial and nonetheless chose to believe these witnesses.  Their testimony was not "unbelievable on its face," and the jury's credibility findings will not disturbed on appeal.  See United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997).

And there was ample evidence Blanco took a "substantial step" toward the commission of the cocaine robbery.  Blanco worked with Mejias and Gamez to plan the robbery, recruited others to help carry it out, flew to Miami and rented a vehicle to use during the robbery and met with the other co-conspirators to review the final details of the robbery plan to ensure that it was carried out effectively.

---

[3]For the same reason, Blanco's argument that he could never take a "substantial step" toward attempting to affect commerce via a robbery of a fictitious cocaine shipment also fails.

10

Contrary to Blanco's argument, these objective acts "strongly corroborate the required culpability" and are not equivocal. See United States v. Root, 296 F.3d 1222, 1227-28 (11th Cir. 2002).

3.  Firearm Offenses

Blanco argues that the evidence does not support his firearm convictions in Counts 5 and 6 because he did not personally carry a firearm. To convict Blanco of the substantive offense of carrying a firearm during and in relation to a drug trafficking offense (Count 6), the government was required to prove that (1) in furtherance of a conspiracy to rob cocaine, (2) a defendant carried a firearm in furtherance of that conspiracy. See 18 U.S.C. § 924(c)(1)(A); United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). A defendant may be liable for a co-conspirator's carrying of a firearm if it was reasonably foreseeable. United States v. Bell, 137 F.3d 1274, 1275 (11th Cir. 1998). To convict Blanco of conspiracy to commit the substantive offense (Count 5), the government was required to prove that (1) a conspiracy existed to commit the substantive offense, (2) Blanco knew of it, and (3) Blanco, with knowledge, voluntarily joined it. United States v. Thompson, 422 F.3d 1285, 1290 (11th Cir. 2005).

Here, the government's evidence supports a finding both that it was reasonably foreseeable to Blanco that some of his co-conspirators would possess

firearms during the planned cocaine robbery and that the co-conspirators agreed ahead of time that some of them would have firearms during the cocaine robbery. In fact, codefendant Sanchez-Estrada testified that Blanco instructed him and his brothers to obtain a firearm because the shipment would be protected by an armed guard. On this advice, one of Sanchez-Estrada's brothers obtained a gun and brought it to the rendevous point. When the conspirators were arrested, law enforcement found two guns in one of the vehicles that was to be used in the cocaine robbery. Thus, a jury could reasonably find that Blanco knew and agreed that others would possess firearms during and in furtherance of the planned cocaine robbery.

## B.    Due Process Claims

We also reject Blanco's claim that his due process rights were violated when transcripts of video and audio recordings of poor quality were introduced and then government witnesses were allowed to testify to the conversations documented in those transcripts. If Blanco was not satisfied with the accuracy of the government's transcripts, he could have prepared and submitted his own transcripts, but he did not. See United States v. Hogan, 986 F.2d 1364, 1376 (11th Cir. 1993). Instead, Blanco stipulated that the transcripts accurately reflected the nature of the conversations and objected only to whether the transcripts accurately

attributed statements to the correct speaker. In response, the district court instructed the jury that the transcripts were to be used to allow them to follow the contents of the conversations as they listened to the tapes, but that the jury must determine the identity of the speakers for themselves. This instruction was sufficient to cure any alleged prejudice from attribution errors in the transcripts. See United States v. Cruz, 765 F.2d 1020, 1024 (11th Cir. 1985). Furthermore, Blanco had ample opportunity to attack the credibility of the government's witnesses who testified to the identity of the speakers on the tapes and has not identified on appeal any inaccuracies in the transcripts or any specific prejudice that occurred. See United States v. Williford, 764 F.2d 1493, 1503 (11th Cir. 1985).

Blanco has also failed to establish prosecutorial misconduct .[4] Blanco points to three statements by the prosecutor during closing arguments: (1) the suggestion the trial judge would instruct the jury that Blanco was guilty of aiding and abetting

---

[4]We ordinarily review claims of prosecutorial misconduct de novo. United States v. Merrill, 513 F.3d 1293, 1306 (11th Cir. 2008). However, where, as here, the defendant fails to object to the prosecutor's comments at trial, we review only for plain error. Id. at 1306-07. To prevail on a prosecutorial misconduct claim, Blanco must show not only improper comments by the prosecutor, but also that those comments prejudicially affected his substantial rights. See United States v. Arias-Izquierdo, 449 F.3d 1168, 1177 (11th Cir. 2006). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhart, 466 F.3d 938, 947 (11th Cir. 2006). In evaluating a claim of prosecutorial misconduct, we examine "the context of the entire trial." United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998) (quotation marks omitted).

13

in the possession of a firearm;[5] (2) the description of Blanco as a professional

criminal,[6] and (3) the characterization of Blanco's attorney as desperate for having

evoked Adolph Hitler during closing argument.[7]

---

[5]Specifically, the prosecutor stated:
[Y]ou will hear from the Judge that the instruction for conspiracy [is] reaching a mutual understanding for a common and unlawful purpose. And you will see that it was Ramon Blanco who reached that mutual understanding. And on that last day when he is there, along with every single other person who is in this conspiracy, Mr. Ontivero, Justino Sanchez-Estrada, when they are all there, Mr. Blanco, along with the other defendants, attempted to do that robbery for cocaine. And Mr. Blanco was well aware that there was going to be a dangerous situation, that weapons were going to be involved and that Mr. Ontivero, the man who [Blanco] came from Chicago with, had that gun. And so Ramon Blanco under the law is guilty for possessing that gun in furtherance and during and in relation to the crime of violence and the drug trafficking crime as the Judge will instruct you under an aiding and abetting type theory.

[6]The prosecutor, referring to codefendant Mejias's testimony, stated:
Mr. Mejias says . . . [w]ell, that's why I tell you these people are professionals. These people, I think it's hard for them to fail.
Mr. Mejias is confirming that the professionals, these people, are coming from Chicago.
Now, this was no small task. This was ripping off 25 to 30 kilograms of cocaine from an armed courier.
Mr. Blanco had his ideas of how [the robbery] should be done, and he gave his professional expertise as to how it should be done when he speaks at the meeting on September 5th.

[7]In his closing, defendant counsel suggested that codefendant Sanchez-Estrada was lying about Blanco's role in the offenses in order to get time off his sentence and then stated:
[I]n January of 1933 Adolf Hitler seized power in Germany and a few days later people started to get arrested for their thoughts and their words.
We live in a free country and you can associate with other people . You can be out there – and you are going to get a jury instruction that to be merely present does not make you guilty.
In rebuttal, the prosecutor stated:
Now we have the burden. But has [defense] counsel gotten so desperate as to evoke Adolf Hitler?
If you understand the analogy, you are smarter than I am. Not only did I not understand the analogy, what relevance whatsoever does Adolph Hitler and

When viewed in context, none of these comments is improper. Although the prosecutor's statement to the jury about the aiding and abetting offense was poorly worded, it, when considered in context, does not show that the government was implying that the district court believed Blanco was guilty, but merely that the judge would provide instructions on that offense. There was evidence from the meeting transcripts and Mejias's testimony that Blanco was known as a professional. Thus, it was not improper for the prosecutor to summarize this evidence in closing.

Furthermore, Blanco has not demonstrated that these comments substantially affected his rights. That is, given the government's overwhelming evidence of Blanco's guilt, Blanco has not shown there was a reasonable probability that, but for the prosecutor's statements during closing arguments, the outcome of the trial would have been different. We readily conclude that the three comments did not constitute prosecutorial misconduct, much less plain error.[8]

---

1933 have to do with this case. But counsel has gotten so desperate in his defense of the defendant, Ramon Blanco, that he invokes some totally nonsensical analogy to Adolph Hitler, because what he is trying to do is avoid the facts of this case, avoid the evidence of this case, the evidence that pinpoints Ramon Blanco as the linchpin to this entire conspiracy.

[8]Blanco also brings a due process challenge to the government's conduct of the sting operation leading to his arrest. However, because Blanco did not raise this claim in a motion to dismiss the indictment, he is barred from raising it on appeal. See United States v. Sanchez, 138 F.3d 1410, 1413 (11th Cir. 1998).

## C.    Reasonableness of 295-month Sentence

At sentencing, the Presentence Investigation Report calculated an advisory guidelines range of 235 to 293 months' imprisonment as to Counts 1 through 5, with a mandatory consecutive 60-month sentence as to Count 6.  Blanco conceded these calculations were correct.

In mitigation, Blanco stressed that there was no actual victim, that he never physically possessed a firearm, that his codefendants received sentences of no more than fifteen years and that his criminal history category of V was overstated because his prior convictions were not for violent offenses and he never spent more than ninety days in jail.  After considering the 18 U.S.C. § 3553(a) factors, the district court imposed a 235-month sentence, at the low end of the advisory range, for Counts 1 through 5, followed by a 60-month sentence for Count 6, for a total sentence of 295 months.

We review the reasonableness of a sentence for abuse of discretion using a two-step process.  United States v. Pugh, 515 F.3d 1179, 1189-90 (11th Cir. 2008).  First, we look at whether the district court committed any significant procedural error and then whether the sentence is substantively reasonable under the totality of the circumstances.  Id.  The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors.  United

16

States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006).[9] Although we do not apply a presumption of reasonableness to a sentence imposed within the correctly calculated advisory guidelines range, we ordinarily expect such a sentence will be reasonable. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

On appeal, Blanco does not challenge the district court's guidelines calculations. Rather, Blanco argues that the district court should have considered the government's sentencing manipulation arising from the arbitrary selection of the drug quantity involved in the sting operation. This Court has included the claim of sentencing manipulation in a review for procedural error. See United States v. Ciskowski, 492 F.3d 1264, 1270 (11th Cir. 2007). A government informant's selection of a fictitious amount of drugs to be stolen in a sting operation is not manipulation of a sentencing factor. See United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998). Thus, the district court did not abuse its discretion in not considering sentencing manipulation in arriving at an

---

[9]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

appropriate sentence.[10]

Blanco argues that his sentence was substantively unreasonable because his criminal history was overstated and his sentence was disproportionate to his codefendants' sentences. The district court considered these arguments and obviously concluded that these factors were outweighed by other § 3553(a) factors. Furthermore, given Blanco's significant involvement in the planning of the cocaine robbery and his substantial criminal history, Blanco has not shown that any sentencing disparity was unwarranted. Under the totality of the circumstances, we cannot say that the district court abused its discretion in imposing a 235-month sentence, at the low end of the advisory guidelines range, for Counts 1 through 5 or the mandatory consecutive 60-month sentence for Count 6.

In conclusion, we affirm Blanco's convictions and sentences on all counts.

**AFFIRMED.**

---

[10]At sentencing, Blanco did not object to the procedural reasonableness of his sentence based on sentencing manipulation. We need not decide whether plain error is the appropriate standard of review because there is no procedural sentencing error in any event.

18