[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13927

_____

D. C. Docket No. 03-00155-CR-4-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VINCENT WILLIAMS,
a.k.a. Vent,
EDDIE OLIVER,
a.k.a. 250,
DEMETRIUS REVERE,
a.k.a Top Cat,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(October 31, 2006)**

Before BLACK and HULL, Circuit Judges, and CONWAY,[*] District Judge.

PER CURIAM:

Defendants Vincent Williams, Eddie Oliver, and Demetrius Revere (collectively, "Defendants") appeal their convictions and sentences. After review and oral argument, we affirm.

## I. BACKGROUND

On March 12, 2003, a grand jury in the United States District Court for the Northern District of Georgia returned a multi-count indictment against several individuals, including Williams, Oliver, and Revere. The indictment ultimately[1] alleged that Williams, Oliver, and Revere, along with twelve other defendants and various unindicted co-conspirators, were members of the Diablos, an Atlanta, Georgia-based street gang. According to the indictment and the evidence at trial,[2] the Diablos had two principal goals: first, to make money via criminal activity, principally drug dealing; and second, to use the money to finance and promote

---

[*]Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

[1]The indictment was superseded twice. The third superseding indictment, on which the three Defendants here were ultimately tried, was returned in March 2004. For the sake of simplicity, we refer to the third superseding indictment as the "indictment."

[2]Defendants challenge the sufficiency of the evidence presented against them at trial, and because Defendants were convicted, we recount the facts in the light most favorable to the government. See United States v. Pipkins, 378 F.3d 1281, 1288 (11th Cir. 2004).

their rap music recordings. Several, but not all, of the Diablos—of whom there were between twenty and fifty—were involved with a "gangster rap" music group that went by the same name. The Diablos were from the Perry Boulevard area of Atlanta and were rivals with a gang from the nearby Hollywood Courts Apartments.

## A. The indictment

Count One of the indictment charged various members of the Diablos with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). Specifically, Count One charged that the members of the Diablos, including Defendants, agreed to conduct and participate, directly and indirectly, in the affairs of the Diablos through a pattern of racketeering activity that included murder, robbery, kidnaping, and drug-dealing. Count One further charged the Diablos as the "RICO enterprise," alleging that the charged defendants, as well as others who were unindicted and/or unknown to the grand jury, constituted an enterprise as defined by 18 U.S.C. § 1961(4)—a group of individuals associated in fact. Count One further alleged that the Diablos were an ongoing organization whose members functioned with a continuing purpose of achieving the objectives of the enterprise, which were, essentially: (1) preserving and protecting the power, territory, and

3

financial well-being of the Diablos through intimidation, violence, and drug deals; and (2) obtaining money and drugs for distribution to finance the Diablos' promotion of their music.

As to these specific Defendants, Count One alleged that Oliver and Williams, along with three other co-defendants and Billy Ladson,[3] were leaders of the Diablos. Revere was alleged to be a participating member, but a non-leader. Moreover, Count One charged each of these Defendants with specific overt acts in furtherance of the conspiracy. Oliver was charged with, inter alia, overt acts 1 (purchase of approximately fifty kilograms of cocaine, from a person known to the grand jury, for distribution between July 1997 and January 1998) and 14 (possession of a quantity of crack cocaine). Williams was charged with, inter alia, overt acts 10 (sale of cocaine, to a person known to the grand jury, from a date unknown until approximately 1998) and 40 (the beating, kidnaping, and robbery of a rival drug dealer at some point between July 2002 and August 22, 2002). Revere was charged with, inter alia, overt acts 16 (shooting at a rival gang member), 34 (possession of a quantity of marijuana), and 38 (flagging down cars and directing them to Maurice Turner, a Diablo and a drug dealer).[4]

---

[3]Ladson was an unindicted co-conspirator who testified at Defendants' trial. Ladson was alleged to be the principal leader of the Diablos.

[4]Defendants Oliver, Williams, and Revere were each charged with other overt acts that were allegedly committed in furtherance of Count One; however, the jury found Defendants

4

Additionally, the indictment charged Oliver with, <u>inter alia</u>, Count Five (possession of fifty grams or more of crack cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), and 851). The indictment also charged Williams with Count Eleven (knowingly and intentionally obstructing, delaying, and affecting commerce by robbery and extortion, in violation of 18 U.S.C. §§ 2 and 1951(a)); Count Twelve (knowingly and intentionally possessing with intent to distribute five kilograms or more of cocaine, in violation of 18 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 851); and Count Thirteen (knowingly and intentionally using and carrying a handgun in furtherance of the commission of a crime of violence or a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A)). The indictment also contained a RICO forfeiture count (Count Fourteen).

## B. Trial

Several co-defendants pled guilty and testified against Defendants Williams, Oliver, and Revere at trial, along with various unindicted persons. The government also presented testimony about and physical evidence resulting from the Defendants' arrests. The relevant testimony and evidence is summarized below.

---

responsible for only the above-described overt acts.

## 1. Billy Ladson

Billy Ladson, also known as "Billy Diablo," described himself as one of the heads of the Diablos. The government contended that Ladson was responsible for the murder of a rival drug dealer named Derrick Colbert, whose street name was "Monkey Man,"[5] as well as the murder of Michael Goss, a potential witness against the Diablos.

Ladson testified that he started Diablos Records, Inc. ("Diablos Records") in late 1997-early 1998, along with Oliver and two other defendants. Ladson explained that the seed money for Diablos Records came from selling drugs, and that he and Oliver both personally invested thousands of dollars in drug money into the record company. Ladson testified that several of the Diablos' song lyrics accurately described the Diablos' actual drug dealings and robberies. Certain of the Diablos' CDs were introduced into evidence, over defense objection, along with lyrics from some of the songs. Some of the songs were played for the jury. The songs graphically, and with explicit lyrics, portrayed the Diablos as an Atlanta-based gang that sold drugs and robbed drug dealers of money and drugs.

---

[5]Randy Brown, a member of the rival Hollywood Courts gang, testified that Monkey Man was the leader of the Hollywood Courts gang and a good friend of Brown's. As described in greater detail infra, Brown testified that in the aftermath of Monkey Man's death, he became the leader of the Hollywood Courts gang and wound up in a gunfight started by Revere and other Diablos.

Although Oliver did not rap on the CDs, Oliver was mentioned by name on at least one of the songs and was cited in the liner notes of the first CD as "Eddie Diablo," the "president" of the Diablos, while Revere was thanked (by Oliver) in the liner notes of the first CD.

Ladson testified that the Diablos did not consider themselves a gang; rather, Ladson testified that the Diablos were an "organization" or a "family"—"an organization in the Mafia . . . sense." Ladson specifically named Oliver and Revere as Diablos and estimated that there were approximately fifty total members of the organization, although only a few of the Diablos, including Oliver and Ladson, were involved with the music side of the organization. Ladson testified that certain people in the Diablos were leaders and others were "people that fell under certain people."

Ladson further explained that Oliver and Williams, along with Ladson and three others, were the leaders of the Diablos.[6] As to Defendant Williams

---

[6]Williams emphasizes that Ladson did not specifically name him as a Diablo and that in response to the question, "Was Vincent Williams one of the Diablos," Ladson answered, "Well, he hung with several of us, but he wasn't over there every day like that." However, Ladson was not testifying as to a complete list of Diablos when he failed to name Williams. Ladson later testified that Williams was a leader of the Diablos, that Williams participated in various Diablo activities, and that Williams even brought other people into the Diablos. Additionally, as discussed infra, multiple other witnesses named Williams as a Diablo. Given that at this stage we take all evidence and inferences in the light most favorable to the government, the jury's determination that Williams was a member of the Diablos (the RICO enterprise) was reasonable and supported by the evidence. See Pipkins, 378 F.3d at 1288.

7

specifically, Ladson testified that Williams supplied him with large quantities (between nine ounces and a kilogram[7]) of powder cocaine approximately once or twice a week for a period of four to six months in 1999, until he became "unavailable"; taught him how to cook crack; and planned and participated in the Diablos' robberies of drug dealers, along with Ladson, Oliver, and other defendants. Ladson further testified that he purchased crack from Williams on "several occasions" before March 1999, although at that time, according to Ladson, Williams was not dealing drugs on Perry Boulevard and Ladson and Williams were not close friends. According to Ladson, Larry Mackey, who was not a Diablo, accompanied Ladson on his first trips to buy crack from Williams. Ladson testified he re-sold the crack he purchased from Williams on Perry Boulevard.

Ladson further testified that Defendant Williams again began supplying him with drugs (between nine ounces to half a kilogram) about once or twice a week in approximately February 2001, after Ladson got out of jail for his alleged involvement in Monkey Man's death. Ladson testified that Williams supplied him with cocaine from February 2001 "until about the first week of April [2001] when [Ladson] was arrested" again.

Additionally, according to Ladson, he and Defendant Williams, "on several

_____

[7]There are approximately thirty-five ounces in a kilogram.

occasions," trailed drug dealers "from one spot to the next after they made [drug] buys or drops, just to see what their routine was," and that the Diablos would often follow "drug dealers until [they] found out the locations . . . where the drugs was stashed at, or a vulnerable point at which [they] could take the drugs from them." Ladson specifically testified that Defendant Williams planned a successful robbery of a drug dealer in Cobb County, Georgia in August 2002, and that while Williams did not accompany a small group of Diablos to that drug dealer's house, he was in charge of "surveillance, staking out, and driving . . . ." Ladson explained that the group participating in the August 2002 robbery continuously telephoned Williams in order to update him on the progress of the crime, and that Williams ultimately received a share of approximately two kilograms of cocaine and $15,000 from the robbery. Ladson further testified that he and Williams invested proceeds from the August 2002 robbery into a land purchase, and that they planned to build a house on the purchased land.

As to Defendant Oliver, Ladson testified that Oliver obtained cocaine from a man named Mekael Daniels in late 1997 through early 1998, some of which Oliver sold himself and some of which (between two and four kilograms) he sold to Ladson for re-sale. Ladson testified that Oliver stopped selling drugs in early 1998 because it was decided that Oliver would focus his attention on the music

9

component of the Diablos; however, Ladson also testified that Oliver "started back selling drugs" for a short period of time in 2000. Ladson further testified that Oliver was arrested in Ladson's "trap," or apartment out of which he sold drugs, with some of Ladson's drugs and some of Oliver's own drugs, on March 15, 2000. According to Ladson, "[a]t that time me, and Mr. Oliver," as well as Diablo Maurice Turner and two other "smaller dealers," were "working together out of that apartment." Additionally, on one of the Diablos' CDs, which was recorded between December 2000 and March 2001, the Diablos rapped about moving from "triple zeros to moving kilos," which Ladson explained meant "moving up" from having nothing by virtue of selling drugs. Ladson testified that Revere and Oliver, along with himself, had "moved up in that sense," and that the "moving up" took place "after . . . Oliver had gotten back into selling drugs."

Ladson further testified that in September 1998, Oliver acted as the driver for Ladson and two others in an armed robbery and kidnaping of a drug dealer named Woo. Additionally, Ladson testified that Oliver handled the bookkeeping for the Diablos' music endeavors, and it is uncontroverted that the Diablos' CDs and other music-related expenses were financed with money from drug sales and robberies of drug dealers. Indeed, Ladson testified that all of the Diablos that were involved with the music side of the organization, including Oliver, put drug money

10

into Diablos Records. Finally, Ladson testified that Oliver acted as a liaison with Officer David Freeman, an Atlanta Police Department ("APD") officer who provided the Diablos with insider information about ongoing police investigations of the Diablos.

Ladson testified that Defendant Revere was a Diablo who sold drugs, including crack cocaine, "on a large level." Ladson explained that Revere maintained a "trap" on Perry Boulevard. Additionally, Ladson testified that in the aftermath of Monkey Man's death in 2000, Randy Brown, a member of the Hollywood Courts gang, became a leader of the Hollywood Courts gang and provoked several shootouts with the Diablos in an attempt to avenge Monkey Man.[8] According to Ladson, a couple of months after Monkey Man's death, he and Revere's brother were visiting one of Ladson's employees at an apartment complex when they encountered Brown and several Hollywood Courts members. Because Ladson and Revere's brother were unarmed, Revere's brother called Revere and several other Diablos in order to provide support. Ladson testified that ten to twelve Diablos, including Revere, arrived at the apartment complex, and a gun battle ensued. According to Ladson, the gunfight began when Revere arrived

_____

[8]Ladson admitted that he was present when Monkey Man died, and the prevailing belief among both the government and the Hollywood Courts gang was that Ladson was responsible for Monkey Man's death.

11

at the complex; located his brother and Ladson; learned Brown's location from his brother and Ladson; approached Brown; and "shot first." Ultimately, Revere was shot in the face and lost an eye, an incident that the Diablos blamed on Brown. Ladson testified that in the aftermath of Revere's wounding, he, Revere, and other Diablos went hunting for Brown at least twice with the intent to kill him.

## 2. Mekael Daniels

Mekael Daniels, a longtime drug dealer who was not a Diablo, testified that he supplied Oliver with drugs beginning in July 1997 and through January 1998. Although Daniels initially supplied Oliver with crack (approximately thirty-one ounces total), in the first week of August 1997, Daniels began to supply Oliver with powder cocaine. According to Daniels, he charged Oliver $22,000 for a kilogram of cocaine and $500 for an ounce of crack. Daniels testified that the first time he supplied Oliver with powder cocaine, he sold Oliver a kilogram; however, Oliver called Daniels back on the same day, advised Daniels that he had already sold the cocaine, and purchased another kilogram. Thereafter, Daniels supplied Oliver with two kilograms of cocaine every Sunday through the first week in January 1998, for a total of approximately forty-two kilograms of powder cocaine (an expense to Oliver of over $800,000). Daniels further testified that he knew Oliver to be a Diablo; that he had once seen Oliver give some of Daniels's drugs to

12

other Diablos, including Ladson and Revere; and that Oliver told him that he was using the cocaine he was purchasing from Daniels to supply Ladson, Revere, and two other Diablos. Daniels testified that he stopped selling drugs to Oliver in January 1998 when Daniels was arrested for violating the terms of his supervised release.

### 3. David Freeman

At all times pertinent, David Freeman was an officer with the APD. Freeman, who grew up in the Perry Boulevard area, provided the Diablos with insider information regarding APD investigations of the Diablos. He was named as a co-defendant in this case, pled guilty to civil rights violations, and testified at trial. Specifically, Freeman testified that he was close friends with Oliver and one other Diablo and that he considered Oliver to be a relative of his.[9] Freeman named Oliver and Revere as Diablos and testified that he: (1) observed Oliver dealing drugs in the Perry Boulevard area in 1998-99; (2) observed Revere selling drugs once or twice in the Perry Boulevard area "[a]round 2001, 2002"; (3) observed Oliver giving orders to Diablos, which were followed; and (4) was told by Oliver that the Diablos had killed Monkey Man because Monkey Man had robbed and killed one of the Diablos' fathers. Freeman further testified that he informed

---

[9]Oliver and Freeman are not actually related; Oliver married into Freeman's best friend's family.

Ladson and Oliver that the APD was investigating a report that Ladson had beaten up a drug dealer and that Michael Goss had witnessed Ladson beating up the drug dealer. Goss was killed by Ladson within weeks of Freeman's meeting with Ladson and Oliver. Freeman also admitted that he regularly failed to arrest the Diablos, including Oliver, when he saw them engaged in criminal activity, and in fact, Freeman specifically testified that he, Oliver, and several other Diablos once placed an individual whom they suspected had stolen drugs from Oliver in Freeman's truck and drove him to Perry Boulevard, where they beat him.

### 4. Demarco Hendrix and Willie Respress

Demarco Hendrix and Willie Respress were both Diablos who pled guilty and testified at trial. Hendrix named Williams, Oliver, and Revere as Diablos, and testified that he had known them for approximately thirteen years, because they all grew up together in the Perry Boulevard area. Hendrix testified that he observed Oliver selling drugs out of Ladson's Perry Boulevard apartment in approximately 2001, and that he had cooked crack cocaine with Williams at Williams's house in 2001-02. Hendrix further testified that he participated in the August 2002 robbery of the Cobb County drug dealer with Williams; that Williams was heavily involved with the approximately month-long preparation and surveillance for the robbery; and that Williams acted as the lookout on the actual night of the robbery instead of

14

accompanying them to the drug dealer's house because Williams knew the victim and did not want to be recognized.[10]

Respress named Oliver and Revere as Diablos. Additionally, Respress testified that on August 29, 2002, he and Revere were involved with several other Diablos in a drug-selling operation at an apartment complex on Perry Boulevard. Respress explained that he "was selling drugs, me and Demetrius [Revere] would flag down cars and direct them to Maurice Turner," and that after he and Revere ascertained from the potential buyers "what they need," they would direct the buyers to Turner to sell "nickels and dimes" (five and ten dollar bags) of crack cocaine. Respress further testified that he had seen Revere in possession of a "couple of bags of weed" (marijuana) in 2002, and that he had seen Oliver in possession of cocaine in 1997-98.

### 5. Larry Mackey

Larry Mackey did not consider himself a member of the Diablos, and he was not indicted in this case; however, he is a convicted felon. Mackey testified that he

---

[10]Hendrix testified that the August 2002 Cobb County drug dealer robbery yielded "like 14 ki's [kilograms], and the money. And everybody pretty much got like 2 ki's and $10,000." Hendrix further testified on cross that he "only seen 14 ki's" as a result of the robbery. Williams contends that because Ladson testified that the August 2002 robbery actually yielded approximately seventeen kilograms, as opposed to fourteen, both Ladson and Hendrix are unworthy of belief. We reject Williams's argument. Taking the evidence in the light most favorable to the government, Hendrix's use of the word "like" and subsequent clarification that he "only seen" fourteen kilograms of cocaine indicate that he was approximating the amount of drugs and money involved in the robbery.

15

grew up in the Perry Boulevard area and used to deal drugs in that neighborhood. He named Oliver and Revere as Diablos and testified that Williams "associated" with the Diablos "also."[11] Mackey testified that he had known Oliver for thirteen or fourteen years and that Oliver had lived with him at one point; that he had known Williams since the early 1990s; and that he had known Revere since the mid 1990s. According to Mackey, he sold drugs with Oliver in 1997-98 in the Perry Boulevard area. Mackey testified that he often observed Mekael Daniels supply Oliver with drugs during that time frame. Mackey would buy some of those drugs from Oliver, particularly in early 1997, and then they would "work[] together" selling the drugs. Mackey further testified that at the same time, particularly in 1998, Williams was also supplying him with drugs for sale in the Perry Boulevard area. Mackey explained that Williams would "front" him drugs; Mackey would sell them and make Williams's money back; and then Mackey would "have extra" for himself. According to Mackey, as between Williams and Oliver, in 1997-98 (and 1998 especially), Williams was his "main supplier," but he

---

[11]Mackey also testified on cross-examination, in response to the question, "Vincent Williams is not a Diablo?" that Williams was "not with the [Diablos] rap group," but that Williams "associate[d]" with the Diablos. Mackey then testified that he himself was not a Diablo, but agreed that he "associate[d]" with the Diablos "[a]s far as drugs." Williams thus contends that Mackey testified that Williams was not, in fact, a Diablo. Again, taking all of the evidence in the light most favorable to the government, we reject Williams's contention. Moreover, several other witnesses testified that Williams was a Diablo, and the jury was free to believe or disbelieve any and all of the testimony as it saw fit. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003).

would get drugs from both. Mackey testified that in 1998, he generally obtained drugs from Williams "every other day." Mackey explained that Williams supplied him with drugs until 1999, and that Oliver supplied him with drugs until Mackey was incarcerated in 2001. Mackey also testified that he "had exchanged drugs" with Revere.

### 6. Terrence Scott

Terrence Scott was incarcerated at the time of trial on charges unrelated to this case, but he worked for Worldwide Records and Distribution ("Worldwide"), a record promotion company, at all times pertinent. Diablos Records was a client of Worldwide's in 2001, and at that time, Scott worked with Ladson and Oliver, as well as other Diablos who participated in the music side of the organization. Scott testified that Oliver and Ladson told him that they financed their CD by selling drugs; that he had bought marijuana and cocaine from Ladson and Oliver for personal use; and that he had "definitely" seen Oliver with firearms and that the Diablos he worked with had pistols in Oliver's vehicle. Scott also testified that he purchased a semi-automatic firearm and two hand pistols from Oliver in winter 2001 for two of his friends, and that Oliver exchanged the weapons for approximately $2200 in cash.

### 7. Randy Brown

17

Randy Brown named Defendants Oliver, Williams, and Revere as Diablos, and he testified regarding the events that took place in the aftermath of Monkey Man's death, including the gunfight in which Revere was shot in the eye. Brown explained that after Monkey Man's death, he took over as the leader of Hollywood Courts; that there were then multiple confrontations between the Diablos and Hollywood Courts; and that the gun battle in which Revere lost his eye took place approximately two months after Monkey Man's death. According to Brown, he dropped a friend off at an apartment complex in the Perry Boulevard/Hollywood Courts area, and he was flagged down by a member of the Diablos while he was leaving. Other Diablos then arrived on the scene, and Brown observed Revere exit his vehicle; proceed into a stairwell area where he seemed to be talking to someone; turn around and face Brown; and start shooting at Brown. Brown testified that he shot back, was shot in the thigh by one of the Diablos, and managed to escape.

### 8. Police testimony and relevant physical evidence

Officer Jason Bilak of the APD testified that he arrested Revere on or about June 12, 2002, in the Perry Boulevard area, for his involvement in a drug deal. Bilak testified that on that date, he observed Revere and Turner exchange a clear plastic bag that contained nineteen separate smaller red bags of marijuana, totaling

18

just under one ounce. A forensic chemist verified the weight and drug type, and the marijuana was admitted into evidence. In Bilak's training and experience, the nineteen smaller bags were packaged the way they were in order to facilitate later distribution; in other words, Bilak did not believe the package was for Revere or Turner's personal use. Revere had $407 on his person at the time of his arrest in June 2002.

Officer C.J. Mills of the APD testified that she and a federal Drug Enforcement Administration ("DEA") agent arrested Oliver on March 15, 2000, at an apartment in a complex on Perry Boulevard. The apartment—Ladson's "trap"—was leased in the name of Ladson's girlfriend, who was also the mother of two of Mackey's children. Mills testified that she was on a team executing a search warrant at the apartment; that she and the DEA agent were assigned the back door, which led into the apartment's kitchen; that Oliver was exiting through the back door with Turner as the officers were entering; and that Oliver was placing cash in his back pocket when the officers saw him. According to Mills, Oliver was immediately arrested by the DEA agent, while Mills ran to stop Turner, who was fleeing back into the apartment and subsequently attempted to jump out a second-story window. Oliver and Turner were the only two individuals whom the police found at the apartment.

19

Mills testified that a search of the apartment's kitchen area, which Oliver was leaving when he was arrested, revealed "over a hundred hits of powder and crack cocaine."  Additionally, in the southwest bedroom, the officers found: (1) a plastic bag on a shelf that contained several smaller red and yellow plastic bags of crack; (2) a cigar box that contained a "crack cocaine cookie," a separate bag of powder cocaine, and additional hits of crack; and (3) a brown box containing an eight-inch round crack cookie.  In the northwest bedroom, the officers found a plastic bag containing "a hundred hits of crack cocaine and 85 hits of powder cocaine," as well as a "slab of crack cocaine" on the bed next to the bag.  Mills explained that the drugs were packaged "for individual sale in various denominations," and that the drugs were not personal use amounts.  Mills testified that Oliver had $2315 in cash on his person at the time of his arrest.  All of the drugs seized at the apartment—over 300 grams of cocaine—were admitted into evidence at trial.

Oliver was subsequently arrested by Agent Craig Kailimai of the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") on a federal warrant pertaining to the charges in this case.  Kailimai testified that after he took Oliver into custody and brought him back to the Atlanta ATF office, he fingerprinted, booked, and photographed Oliver, and then "gave him the courtesy of advising him the entire

elements of the Indictment, exactly what it was he was being arrested for." At that point—"prior to any Miranda[12] warnings being read to him"—Oliver "blurted out an exclamation . . . . to the effect that no one but himself or Barry Adams[13] had the right to speak for the Diablos." At that point, Kailimai advised Oliver of his Miranda rights, and Oliver said that he wanted a lawyer.[14]

## C. Conviction and sentencing

The jury convicted Defendants Williams, Oliver, and Revere of Count One (RICO conspiracy), finding that Williams committed overt acts 10 and 40; Oliver committed overt acts 1 and 14; and Revere committed overt acts 16, 34, and 38. Additionally, Williams was convicted of Count Eleven (delaying the movement of articles in interstate commerce by robbery and extortion), Count Twelve (possession with intent to distribute five kilograms of cocaine), and Count Thirteen (aiding and abetting the use of firearms in relation to Counts Eleven and Twelve), and Oliver was convicted of Count Five (possession with intent to distribute fifty grams of crack).

---

[12]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[13]Barry Adams was not named in the indictment, but Ladson testified that Adams was one of the founders of Diablos Records, and Kailimai testified that he knew Adams was connected to the music production side of the Diablos.

[14]Defendant Williams was ultimately arrested in a traffic stop on an outstanding warrant. No drugs or guns were in Williams's possession at the time of his arrest.

Williams was sentenced to 294 months' imprisonment, followed by 5 years' supervised release. Oliver was sentenced to 292 months' imprisonment, followed by 5 years' supervised release. Revere was sentenced to 120 months' imprisonment, followed by 5 years' supervised release.

## II. DISCUSSION

Defendants Williams, Oliver, and Revere appeal their convictions and sentences. Each Defendant challenges the sufficiency of the evidence against him.[15] Additionally, Williams and Revere contend that the district court erred in allowing the government to introduce the Diablos' rap music and lyrics into evidence.[16] Williams further contends that: (1) the government committed misconduct by asserting facts in its opening and closing statements not supported by the evidence and deliberately eliciting witness testimony regarding the legal term "associated";[17] and (2) the district court erred in denying his request to change the order of certain portions of the jury verdict form.[18] Additionally, Oliver

---

[15]We review a challenge to the sufficiency of the evidence de novo, and view all evidence in the light most favorable to the government. Pipkins, 378 F.3d at 1288.

[16]We review a district court's evidentiary rulings for abuse of discretion. United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996).

[17]Where a defendant fails to object to alleged prosecutorial misconduct in the district court, we review the challenged conduct for plain error. United States v. Wilson, 149 F.3d 1298, 1301 n.5 (11th Cir. 1998).

[18]We review verdict forms and jury instructions for abuse of discretion. United States v. Poirier, 321 F.3d 1024, 1031 (11th Cir. 2003).

22

contends that the district court erred in overruling his motion to suppress his statement to police officers that only he could speak for the Diablos.[19]  Finally, Defendants each raise sentencing issues.  Oliver contends that he was improperly given a three-level increase in his advisory Guidelines offense level for his role as a manager of the Diablos; Williams contends that the district court erred in imposing a harsher sentence on him vis a vis his co-defendants; and Revere contends that he was improperly sentenced based on an advisory Guideline regarding attempted murder and that his sentence was unreasonable.[20]

After review of the record, as well as the arguments of the parties in both their briefs and at oral argument, we conclude that all of Defendants' claims of error lack merit.  Only Defendants' sufficiency of the evidence arguments warrant further discussion.

### A.  Participation in the conspiracy

Defendants Williams, Oliver, and Revere all contend that the government

---

[19]The district court's denial of a motion to suppress presents a mixed question of law and fact: we review the district court's factual findings for clear error, and the application of the law to those facts de novo.  United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004).

[20]Whether a particular Guideline applies to a given set of facts is a question of law that we review de novo; a district court's finding of facts that support sentencing enhancements are reviewed for clear error.  United States v. Ndiaye, 434 F.3d 1270, 1280 (11th Cir. 2006). Additionally, a defendant's ultimate sentence is reviewed for reasonableness in light of the factors found in 18 U.S.C. § 3553(a).  United States v. Williams, 435 F.3d 1350, 1353-54 (11th Cir. 2006).

23

failed to establish that they agreed to participate in the conspiracy or that they were even "associated" with the criminal "side" of the Diablos.

To sustain a substantive RICO conviction under 18 U.S.C. § 1962(c), the government must establish: (1) the existence of an enterprise that affects interstate commerce; (2) that a defendant "associated" with the enterprise; (3) that the defendant participated in or conducted the enterprise's affairs; and (4) that the defendant's participation was done through a pattern of racketeering activity. 18 U.S.C. § 1962(c); see also United States v. Goldin Indus., Inc., 219 F.3d 1271, 1274 (11th Cir. 2000). It is unlawful to conspire to violate § 1962(c) under 18 U.S.C. § 1962(d).

In order to establish a RICO conspiracy under § 1962(d), the government must prove that a defendant objectively manifested, through words or actions, an agreement to participate in the affairs of an enterprise through the commission of two or more predicate crimes. United States v. To, 144 F.3d 737, 744 (11th Cir. 1998). The focus is on the defendant's agreement to participate in the enterprise through the pattern of racketeering activity, not on any agreement to commit the individual predicate crimes. Id. The agreement to participate can be shown in one of two ways: (1) the government may show that the defendant agreed to the overall objective of the conspiracy, through circumstantial evidence showing that the

24

defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity; or (2) the government may show that the defendant agreed personally to commit two predicate crimes and therefore agreed to participate in a "single objective" conspiracy. Id. Mere association with co-conspirators or knowledge of their illegal activity is not enough to establish a defendant's agreement to participate in the conspiracy; RICO punishes "conduct, not status." Id. at 746. As for the enterprise itself, it need not be a legal entity such as a corporation or partnership; it may also be a group of persons associated together for a common purpose of engaging in a course of conduct. Id. at 744.

Here, the evidence, when viewed in the light most favorable to the government, established that the Diablos were a "family"-type organization engaged in extensive criminal activity; that Defendants were all members of the Diablos; and that Defendants knew of and agreed to participate in the Diablos' criminal affairs. The Diablos sought to make money from drug trafficking and robberies and to funnel some of that money into Diablos Records, and they used violence and intimidation to achieve their goals.

Without merely repeating the facts outlined above, Defendants were each named by multiple witnesses as Diablos who engaged in criminal activity with

other Diablos. In fact, Defendants Oliver and Williams were named as two of the leaders of the Diablos. Williams supplied Ladson with drugs for re-sale over two separate extended periods and planned at least one robbery in which several Diablos participated. Additionally, contrary to Williams's contention that he merely knew Ladson and other Diablos and was not actually a Diablo himself, Ladson testified that Williams was one of the leaders of the Diablos and eventually brought others into the Diablos.

As to Defendant Oliver, from late 1997 through early January 1998, Daniels supplied Oliver with approximately forty-two kilograms of cocaine, and Oliver passed that cocaine on to other Diablos for re-sale. Additionally, Oliver and Ladson sold drugs together not only in late 1997 through early 1998, but also in 2000-01, and in March 2000, Oliver was arrested at Ladson's "trap" along with Turner (another known Diablo) and a large quantity of drugs and money. Ladson testified that in March 2000—a time at which Oliver claims he had ceased drug activity in order to focus on the music side of the Diablos—he, Turner, and Oliver were selling drugs out of his "trap." Additionally, there was testimony that Oliver acted as a driver for other Diablos in a robbery of a drug dealer; was a liaison with Freeman, the Diablos' police informant; and sold drugs and guns to Scott. Oliver even admits that he was a leader of Diablos Records, an organization that was

26

undisputedly financed by drug money.

Finally, as to Defendant Revere, multiple witnesses testified that he sold drugs as a Diablo; Ladson testified that Revere sold drugs "on a large level"; Revere was arrested with Turner as they were exchanging marijuana packaged for re-sale; Daniels testified that Oliver passed some of his cocaine on to Revere and other Diablos for re-sale; and Respress detailed Revere's involvement in a drug-selling operation with Turner, Respress, and other Diablos. Moreover, Revere joined approximately ten other Diablos when called to protect Ladson and Revere's brother from Brown and other Hollywood Courts members; started the gun battle in which he and Brown were wounded; and subsequently accompanied and assisted several Diablos in seeking revenge against Brown.

Thus, viewing the evidence in the light most favorable to the government, it seems clear that the Diablos were a RICO enterprise; that Defendants were members of the Diablos; and that Defendants agreed to and in fact did further the Diablos' overall objectives through their actions as described above.

## B. Overt act 10 (Williams)

Williams further contends that the government failed to prove that Williams (or Mackey) was part of the alleged conspiracy at the time he participated in overt act 10—Williams's sale of cocaine to Mackey over a continuing period through

27

1998. Because overt act 10 was one of the two predicate acts found by the jury in support of its conviction of Williams on Count One, Williams argues that his conviction on Count One must be overturned.

Williams's argument is flawed because it is premised on a contention that Mackey "said that [Williams] was not a Diablo." In actuality, that was not the substance of Mackey's testimony. As discussed supra at Section I(B)(5) and note eleven, Mackey testified that Williams "associated" with the Diablos, although Williams was "not with the rap group." While Mackey also agreed that he too "associate[d]" with the Diablos "[a]s far as drugs," even though he himself was not a Diablo, viewing the evidence in the light most favorable to the government, the jury could have reasonably concluded that Williams was a Diablo at the time he sold drugs to Mackey. Specifically, in addition to Mackey's testimony that Williams "associated" with the Diablos at the time of overt act 10, multiple witnesses named Williams as a Diablo generally (without regard to time limitations), and there was significant evidence as to Williams's later membership in the Diablos. Moreover, Mackey testified that overt act 10 occurred in the Perry Boulevard area, which was Diablo-controlled territory and an area in which several witnesses testified the Diablos would not permit non-Diablos to sell drugs. Accordingly, a reasonable jury could have concluded that Williams was part of the

28

conspiracy at the time he sold drugs to Mackey in 1998—overt act 10.

In passing, Williams also argues that there was no continuity or relatedness between overt act 10 and the other overt acts. "In order to prove the required two predicate acts, the government must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996). Here, as discussed, the overt acts were all related in that they revolved around the purposes of making money for the Diablos from drug sales and robberies; funneling some of that money into Diablos Records; and protecting Perry Boulevard from rival drug dealers. Cf. id. at 1525-26 (acts were related in that, inter alia, they revolved around the purposes of silencing dissension and retaliating against community resistance to the criminal organization, and the acts facilitated the organization's racketeering activities). Moreover, although the two predicate acts attributed to Williams by the jury were relatively far apart in time (overt act 10—the cocaine sales to Mackey—took place in 1998, while overt act 40—the kidnaping and robbery of a rival drug dealer—took place in 2002), Ladson testified that Williams sold him cocaine in 1999 until Williams became "unavailable"; that Williams taught him how to cook crack; that Williams participated in and planned multiple robberies for the Diablos; and that Williams supplied him with drugs in 2001 until

Ladson's arrest. The evidence established that both Williams and the Diablos enterprise engaged in long-term, continuing drug-related activity designed to profit the Diablos. "[I]t is not the length of the defendant's connection with the 'association,' or enterprise, that poses the threat of continued racketeering activity. Rather, it is the [enterprise's] long-term existence and regular way of doing business that poses the threat of continued racketeering activity." United States v. Church, 955 F.2d 688, 694 (11th Cir. 1992). Accordingly, we reject Williams's relatedness and continuity arguments as well.

### C. Overt act 40 and Counts Eleven, Twelve, and Thirteen (Williams)

Williams also contends that the government failed to present sufficient evidence to support the jury's finding that Williams committed overt act 40 (the 2002 drug dealer robbery), as well as the jury's guilty verdicts on the independent counts of the indictment that arose out of the robbery (Counts Eleven-Thirteen). This argument lacks merit as well.

Williams's primary contention here is that the government's only evidence about his involvement in the robbery was the "conflicting testimony" of Ladson and Hendrix. Williams points out that Hendrix testified that the Diablos obtained fourteen kilograms of cocaine in the robbery, while Ladson testified that they obtained seventeen kilograms of cocaine. Williams also points out that Hendrix

30

testified that Ladson was the one who kept in constant telephone contact with Williams throughout the robbery, while Ladson testified that a different Diablo actually made the phone calls. According to Williams, these discrepancies mean that both Ladson and Hendrix are unworthy of belief and their testimony should be disregarded, and that if we do disregard their testimony, there is no corroborating evidence with regard to the robbery.

We reject Williams's argument. The essence of Hendrix's and Ladson's testimony was the same: Williams conceived of a plan to rob a rival drug dealer, picked the target, acted as surveillance during the robbery, and was constantly updated by the Diablos who actually performed the robbery. The robbery yielded a great deal of cocaine—seventeen kilograms by Ladson's recollection, and "like" fourteen kilograms by Hendrix's recollection, see supra note 10—and a great deal of money. The small inconsistencies in Hendrix's and Ladson's testimony are simply too insignificant for us to disregard the substance of the testimony. Moreover, the jury is responsible for credibility determinations. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003).

Williams also contends that the government failed to establish (a) that he knew that what was originally a planned burglary would ultimately turn into a

31

kidnaping and robbery,[21] and (b) that his robbery co-defendants would be carrying firearms or to link Williams to a firearm in any way (for purposes of Count Thirteen).

Count Thirteen charges Williams with aiding and abetting the use of a firearm in furtherance of a crime of violence or a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A). To prove aiding and abetting, the government had to establish that Williams had actual knowledge that a firearm would be used in furtherance of the crime.[22] See United States v. Hamblin, 911 F.2d 551, 558-59 (11th Cir. 1990); United States v. Pendegraph, 791 F.2d 1462, 1465-66 (11th Cir. 1986).

---

[21]Witness testimony established that the original plan was for the Diablos to break into the drug dealer's house and steal drugs and money (a burglary); however, upon breaking and entering, the Diablos ascertained that there was no contraband at the house. They then decided to wait for the drug dealer to return to the house. When the drug dealer returned, the Diablos kidnaped him and ascertained the (off-site) location of the drugs via force and intimidation. We refer to the event as a "robbery" for the sake of simplicity and because ultimately, the event escalated into a robbery.

[22]The government argues that it did not have to establish that Williams had actual knowledge. Instead, the government contends that we should use the so-called Pinkerton doctrine to affirm Williams's 18 U.S.C. § 924(c) conviction on the grounds that Williams's co-conspirators' use of a firearm was "reasonably foreseeable" to Williams. See Pinkerton v. United States, 328 U.S. 640, 645-48, 66 S. Ct. 1180, 1183-84 (1946) (a party to a continuing conspiracy may be held responsible for substantive offenses committed by a co-conspirator in furtherance of the conspiracy, even when he did not participate in the substantive offenses or have any knowledge of them); see also United States v. Diaz, 248 F.3d 1065, 1099-1100 (11th Cir. 2001) (Pinkerton doctrine may be used to establish a substantive violation of § 924(c) by a person "not present . . . . if the carrying or using of a firearm by a coconspirator is a reasonably foreseeable action of the conspiracy"). We need not address this point, because we conclude that a reasonable jury could have concluded that Williams had actual knowledge that a firearm would be used in furtherance of the crime.

32

Here, taking all of the evidence in the light most favorable to the government, there was ample evidence that Williams knew that a firearm would be used in furtherance of the crime. First, Williams was named by both Ladson and Hendrix as the planner of the robbery. The jury could have reasonably concluded that because Williams planned the crime, he knew that the Diablos executing his plan would be using firearms. Second, Scott testified that many Diablos, including Ladson, carried firearms. Third, Williams planned and was present for an earlier, nearly identical Diablos robbery of a drug dealer in which firearms were used. Specifically, Hendrix testified—and Williams presented no evidence to the contrary—that Williams had planned a robbery of a drug dealer in 2001, in which Williams, Hendrix, and two other Diablos participated. In the 2001 robbery, Williams kept watch while Hendrix and the two other Diablos waited—with firearms—for the drug dealer to come home, and when the drug dealer arrived, the Diablos kidnaped him and forced him to tell them where he was keeping a large quantity of cocaine. Finally, multiple witnesses testified that the Diablos actually at the scene of the robbery constantly updated Williams throughout the crime. In light of the evidence that Williams planned this robbery; earlier planned a nearly identical robbery that involved firearms; was kept apprised of all developments throughout this robbery, and that many Diablos carried firearms, the jury could

33

have reasonably concluded that Williams knew firearms would be used in furtherance of the crime.

### D. Overt acts 1 and 14 (Oliver)

In addition to his contention that the evidence failed to establish that he agreed to participate in the criminal conspiracy with the rest of the Diablos (an argument discussed and rejected above), Oliver raises specific arguments as to the sufficiency of the evidence for his overt acts. With regard to overt act 1, Oliver contends that there was no evidence that his purchase of cocaine from Daniels was part of the alleged conspiracy. However, Daniels himself testified that he observed Oliver provide cocaine that he had purchased from Daniels to other known Diablos, and Daniels further testified that Oliver told him that he was using Daniels's cocaine to supply other Diablos. Moreover, selling drugs to finance the production of the Diablos' music was one of the objectives of the conspiracy, and there was evidence that Oliver invested drug money in Diablos Records and was the president of and bookkeeper for Diablos Records. Thus, taking all of the evidence in the light most favorable to the government, we must reject Oliver's argument as to overt act 1.

As to overt act 14, Oliver raises two arguments. First, Oliver contends that he was "merely present" and attempting to leave the scene on March 15, 2000, and

that mere presence is insufficient to support his conviction. While Oliver is correct that mere presence at the scene of drug activity, even coupled with flight, is generally insufficient proof of guilt, see United States v. Pantoja-Soto, 739 F.2d 1520, 1526 (11th Cir. 1984), in this case, taking the evidence in the light most favorable to the government, we must reject Oliver's claim that he was "merely present" at Ladson's "trap" on the day of his arrest. Most critically, Ladson testified that in March 2000, he, Oliver, Turner, and two other Diablos were selling drugs out of his "trap." The evidence also established that Oliver dealt drugs for and with other Diablos on a massive scale in the late 1990s; that Oliver handled the bookkeeping for Diablos Records and that Diablos Records was financed by drug money; and that Oliver was the Diablos' liaison with Freeman for the purpose of obtaining insider information about ongoing police investigations of the Diablos, including their drug activity. Oliver was not merely present on March 15, 2000. See United States v. Brazel, 102 F.3d 1120, 1134 (11th Cir. 1997) (testimony regarding defendant's participation in other aspects of drug operation plausibly showed defendant was not merely present at scene where drugs were seized).

Oliver's second argument with regard to overt act 14 is that simple possession of crack was not charged in Count One of the indictment as one of the objects of the conspiracy. According to Oliver, because the indictment does not

include simple possession as a type of racketeering activity in which the Diablos allegedly participated, the jury's finding that he committed overt act 14 is insufficient to sustain his Count One conviction. Oliver tacitly concedes that if the government had charged and proven possession with intent to distribute in overt act 14, that could have supported his RICO conviction, but he contends that because the government merely alleged and proved simple possession, he is entitled to a reversal. Essentially, Oliver argues that there was a variance between the indictment and the proof at trial, and that the variance compels reversal on Count One. See United States v. Starrett, 55 F.3d 1525, 1552-53 (11th Cir. 1995).

This Court has previously observed that "'[b]ecause of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim [of variance] could not be made . . . .'" Id. at 1552 (citation omitted). Accordingly, in order to prevail on a variance claim, a defendant must show: (1) that a "'material variance'" occurred; and (2) that he suffered "'substantial prejudice'" as a result of the variance. Id. at 1553 (citation omitted).

As in Starrett, we need not even address whether the variance alleged by Oliver was material, because Oliver has failed to establish the second prong—substantial prejudice. In order to establish substantial prejudice, a

defendant must show either: (1) that the alleged variance was so great that he was unfairly surprised and had an inadequate opportunity to prepare a defense; or (2) that due to the number of defendants in the case and the number of predicate acts charged, there was a substantial likelihood that the jury transferred evidence from one defendant to another. Id. at 1553. Here, in addition to attributing overt act 14 (possession of crack on March 15, 2000) to Oliver, the jury also convicted Oliver on Count Five of the indictment, and Count Five did in fact charge Oliver with possession with intent to distribute crack for his activities on March 15, 2000. Because Oliver knew that he was facing a separate charge of possession with intent to distribute in Count Five, Oliver cannot be said to have suffered unfair surprise as a result of any variance that occurred with regard to overt act 14. Moreover, Oliver points to no evidence—and indeed, does not even argue—that the jury transferred evidence from one defendant to another in finding him responsible for overt act 14. Accordingly, we reject Oliver's contentions as to overt act 14.

## III. CONCLUSION

For all of the foregoing reasons, we affirm Defendants' convictions and sentences.

**AFFIRMED.**